PARKER *v.* NEW ORLEANS, B. R. & V. R. Co. *et. al.*, (HAMLIN, Intervenor.)

*(Circuit Court, W. D. Louisiana.    January Term, 1888.)*

1. RAILROAD COMPANIES—MORTGAGES—FUTURE PROPERTY.
    In equity, future property may be mortgaged.    A railway company, under the laws of Louisiana, when authorized to borrow money for construction purposes, may mortgage such property as it may acquire in the future, and as soon as the property is acquired the mortgage operates on it.

2. SAME.
    Obviously, it would be difficult if not impracticable, for a railway company to specifically describe future property that it might acquire.    When such property is mortgaged, the mortgage attaches to property subsequently acquired as if it had been described specifically in the act; it is entitled to the same effect in law as if it had been a judicial mortgage.

3. PUBLIC LANDS—RAILROAD GRANTS—CONDITIONS.

Where lands have been granted *in præsenti* to a railway company to aid its construction, and congress afterwards allows the grantee to assign the lands to another company, the government, but not the latter company, might have questioned the title on the ground that the grantee has failed to perform the conditions imposed in the grant. When a grant of lands *in præsenti* is made to a railway company, and a map designating the route is filed in the proper office, title to the lands, previously imperfect, acquires precision, and attaches to the lands.

4. RAILROAD COMPANIES—MORTGAGES—REINSCRIPTION.

It is not necessary in Louisiana to the validity of a railway mortgage, given to raise money for construction purposes, that it should be reinscribed.

5. SAME—MORTGAGE—RAILROAD GRANT.

The language used in this mortgage act embraces the lands granted to defendant company and assigned to N. O. P. Ry. Co. The N. O. P. Ry. Co. took the lands in question with such liens in law and equity as the grantee had imposed on them, in favor of the *bona fide* holders of the bonds sued on, and with full knowledge of all the facts. The court in this case will not go into the question as to whether one or the other or neither of the parties earned the land grant, or inquire out of whose money or earnings the N. O. P. Ry. was built. The equitable rights of complainants cannot be affected by the result of such an inquiry.

*(Syllabus by the Court.)*

In Equity. Bill for the foreclosure of a railroad mortgage.

*A. Goldthwait, A. H. Leonard,* and *Rouse & Grant,* for complainants.

*Howe & Prentiss* and *Dillon & Swayne,* for defendants.

BOARMAN, J. The complainant J. D. Parker, a citizen of Illinois, being a *bona fide* holder of one bond for $1,000, with ——— interest coupons attached, sues for amount of over-due coupons, for foreclosure, and for general relief. W. A. Hamlin holds five of the same kind of bonds, and joins in the bill, adopts its allegations, and asks for same relief. The bill is brought against the New Orleans, Baton Rouge & Vicksburg Railroad Company, domiciled at New Orleans, Louisiana; S. D. McEnery, governor of Louisiana; the Union Trust Company of New York; J. F. Dillon and Henry Alexander, of New York; and the New Orleans Pacific Railway Company, of Louisiana. The defendant company the Union Trust Company and S. D. McEnery made no appearance, and judgment *pro confesso* was entered against them. The New Orleans Pacific Railway Company, J. F. Dillon, and Alexander answered. In their answers are set up the following defenses: (1) That future property cannot be mortgaged under the laws of Louisiana; (2) that the future property, claimed to have been included in the mortgage act, was not so described as to notify third persons; (3) that the lands granted by congress by act March 3, 1871, never vested in the defendant company; (4) that the mortgage act to secure the bonds was never reinscribed; (5) that the lands granted by congress to defendant company were not embraced in the terms of the mortgage act.

Before considering these defenses, and the issues made by the pleadings, let us recite, substantially, such of the evidence as is necessary to be considered in this case. By an act of the Louisiana legislature of December 31, A. D. 1869, certain persons were constituted a body corporate, under the name of the New Orleans, Baton Rouge & Vicksburg Railroad Com-

pany, and they were invested with power to construct a railroad from New Orleans to any point on the boundary line dividing the states of Mississippi and Louisiana, with a view of continuing such railway to Vicksburg, in Mississippi, with branch lines to Baton Rouge, and thence to Shreveport, and to such other points on the Mississippi river as may be deemed advisable, and to connect the main line with the roads of other companies, and with mines and manufactures in Louisiana. The capital stock was to be $1,000,000, and an organization was to be effected as soon as $500,000 was subscribed and 5 per cent. thereon paid in. An organization was effected, and in October, 1870, the company issued first mortgage construction bonds to the amount of ————, and to secure their payment executed the mortgage set up by complainants. The property subjected to the mortgage is recited in the act to be as follows: "The whole of the main line of railroad and its branches and connecting lines, including a branch line commencing at the city of Baton Rouge, and extending thence" through certain named parishes "* * * to Shreveport, and also a branch road commencing at the main line in the parish of East Baton Rouge, and extending through" certain named parishes "* * * to the Mississippi river at the city of New Orleans, together with all the rights of way, road-bed, rails, depots and stations, shops, buildings, and engines, cars, tenders, and other rolling stock; also all real and personal estate within the state of Louisiana owned by said company at the date of the mortgage, or which may be acquired by it thereafter, appurtenant to, or necessary for the operation of, said main line of said railroad, or any of said branches connecting with said main line, or to be connected therewith. Also all other property, real and personal, of every description and kind whatsoever, and wheresoever situated in the state of Louisiana, which is now owned, or shall be hereafter acquired, by said company, and which shall be appurtenant to, or necessary for the operation of, said main line of railroad, or any of said branches. Also all the tenements, hereditaments, and appurtenances thereunto belonging, and all of the estate, right, title, and interest, legal and equitable, of the said company and its successors and assigns therein, together with the corporate franchises and privileges of said company, at any time granted, or to be granted, by the state of Louisiana relative to the construction, operation, or use of said railroad within said state."

By an act March 3, 1871, incorporating the Texas Pacific Railway Company, lands were granted to the defendant company to aid in the construction of a railway from New Orleans to Baton Rouge; thence, by way of Alexandria, to connect at Shreveport with the Texas Pacific Railway. November 11, 1871, the defendant company filed, in the general land-office, a map designating the route of the line from Baton Rouge, via Alexandria, to Shreveport. In 1881 defendant company transferred, by an act of conveyance, all the lands which had been granted to it by congress March 3, 1871, to the New Orleans Pacific Railway Company, one of the parties defendant in this suit. In March, 1881, the United States issued patents to said New Orleans Pacific Railway Company for 679,287 acres of land, situated in different parts of the state. The mort-

gage act to secure the defendant company's bonds was recorded in New Orleans in 1870. It was also recorded in several of the parishes through which the main line and branches were to run. At the time of the assignment of the lands to the New Orleans Pacific Railway Company, no work on the main line or branches had been begun or done by defendant company.

The defenses relied on by defendants will be considered in the order in which they have been herein stated. The principles and rules of equity are administered in the federal courts in Louisiana as they are elsewhere in the Union.

1. In equity, future property may be mortgaged. A railroad company authorized to borrow money and issue bonds to enable itself to construct and stock its road, may mortgage such property as it may acquire in the future, and as soon as the property is acquired the mortgage operates on it. 1 Jones, Mortg. § 153; *Shaw* v. *Bell*, 95 U. S. 10; 2 Story, Eq. Jur. § 1040; *Pennock* v. *Coe*, 23 How. 117; *Dunham* v. *Railway Co.*, 1 Wall. 254; *Mitchell* v. *Winslow*, 2 Story, 630 ; *Pierce* v. *Emery*, 32 N. H. 484. The jurisprudence of Louisiana on this subject shows that article 3308, Rev. Civil Code, does not forbid juridical persons to mortgage future property. In this respect such persons are governed by legislative enactments. Under act of the Louisiana legislature No. 145, session 1854, and act 341, session 1855, a railroad company may mortgage its road, completed and to be completed; and by act No. ——, session 1856, such companies are authorized to mortgage their franchises and all property to aid in the construction of their railroads. These several statutes were re-enacted in sections 726, 727, 2396, 2397, of the Revised Statutes. In the case of *Bell* v. *Railroad Co.*, 34 La. Ann. 785, the Louisiana supreme court held that a railway company may mortgage its franchises and all of its property, present and prospective. The defendant company's charter shows an express power to mortgage future property.

2. In the case just cited it was held that the mortgage "attaches to property subsequently acquired as effectively as if it had been described specifically in the act; it being entitled to the same effect as if it had been a judicial mortgage." Obviously, it would be difficult, if not impracticable, for a railway company to specifically describe future property that might be acquired by grant or otherwise, and the generality of the language used in the mortgage act should not be fatal objection to the legal efficacy of the act relied on by complainants. *Wilson* v. *Boyce*, 92 U. S. 325; *Jackson* v. *Delancey*, 4 Cow. 427; *Pond* v. *Bergh*, 10 Paige, 140.

3. The New Orleans Pacific Railway Company claims to be, and doubtless is, the assignee of the lands granted by congress, and, as such assignee, the government has issued patents to it for 679,287 acres of said lands; therefore it is contended by complainants that said company should not be heard to dispute that title vested by reason of said grant in defendant company. Whether this contention be correct or not, it seems to be clear that congress, in using the words "there is hereby granted to said company" alternate sections, etc., intended to make, and did make, a grant *in præsenti* to the defendant company. In *Railway Co.*

v. *Railway Co.*, 97 U. S. 496, the court, speaking of the legal effect of such words in a grant as "there is hereby granted," etc., say they "impart a grant *in præsenti*, not one *in futuro*, or the promise of a grant" * * * "It is true that the route of the road, in this case as in those cases, to aid in the construction of which the act was passed, was to be afterwards designated, and, until designated, the title could not attach to any specific tracts. The grant was of sections afterwards located, and this location depended on the route established. When that was settled, the location became certain, and the title that was previously imperfect acquired precision, and attached to the lands." *Schulenberg* v. *Harriman*, 21 Wall. 60; *Railroad Co.* v. *U. S.*, 92 U. S. 738.

4. It is provided by statute that mortgages executed by railway companies in Louisiana to raise money for their construction need not be reinscribed. Rev. St. La. §§ 726, 727, 2396, 2397.

5. Are the lands which were granted to the defendant company subjected to the mortgage executed to secure these bonds? The effort to solve this question leads us into difficulties which often attend the interpretation of the most carefully written agreements. In judicially determining whether or not the act we are now considering operates on the lands in question, we are authorized, under well-established rules of law, to consider the language used in the act; the extent and nature of the authority of the contracting parties; the intention, object, or purpose they had, or may have had, in so contracting; the character and use of the property subjected to the mortgage, and circumstances attending its execution. 3 Wood, Ry. Law, 1617; *Smith* v. *McCullough*, 104 U. S. 25. The right and authority of defendant company to subject all of its present and prospective property, as well as its franchises, and privileges, to this mortgage, seems to be clearly shown by the laws of Louisiana, and by its charter. It seems, too, to be well settled that when a railway company is empowered, by its charter, to mortgage all of its property, privileges, and franchises, after-acquired property passes, as an incident to the franchise to acquire property, by a mortgage of the franchise and property of the company. Such a mortgage seems to be a conveyance of the property and franchises of the company as an entire thing. *Pierce* v. *Emery*, 32 N. H. 484; *Phillips* v. *Winslow*, 18 B. Mon, 431; *Willink* v. *Banking Co.*, 4 N. J. Eq. 377. Under this principle, a mortgage given by a railroad company on its franchises and road to be thereafter built, covers a branch road not in contemplation at the time of the mortgage. *Coe* v. *Railroad Co.*, 4 Amer. & Eng. R. Cas. 513.

Such circumstances as may be gathered from the evidence shows that a great scheme for building a railway from New Orleans to Vicksburg, with branch lines to Baton Rouge and Shreveport, and to such points on the Mississippi river as may be thought advisable, and to connect the main lines with the railways then being built, or in operation, in adjoining states, and with mines and factories in Louisiana, engaged the attention and effort of certain persons, who obtained a charter granting the amplest powers to build the New Orleans, Baton Rouge & Vicksburg Railroad, from the state legislature. The capital stock was fixed at

$1,000,000; the subscriptions at $500,000; and as soon as $25,000 was paid in, the company was organized.  In the act the state gave the right of way through public lands, and authorized the issuance of second mortgage bonds to the amount of $12,500 per mile of the main line and branches, the bonds to bear 8 per cent. interest, to be guarantied, principal and interest, by the state, and to be secured by a mortgage on all the property owned by the company at the date of the mortgage, or which might thereafter be acquired.  The company was also authorized to issue first mortgage construction bonds, to be secured by a mortgage on the property described in the act which is herein quoted.  In addition to all this, aid was solicited and obtained by defendant company from the goverment.  Congress, in the March following the issuance of these bonds, having before it the bill to incorporate and aid in the building of the Texas Pacific Railway; granted, in that bill, over 1,000,000 acres of land to defendant company.  Rich in franchises and munificent land grants, the company had no money beyond the paltry sum of $25,-000 paid in on subscriptions.  The company issued 6,250 bonds, each for $1,000, payable in 40 years, with 8 per cent. interest, in New York, or two hundred pounds sterling at London.  The bonds are dated October 1, 1870.  The act granting the lands was approved March 3, 1871. It is contended by complainants' counsel, and we think with a great deal of force, that it was, at the time these bonds were issued, a matter of public history, of which the court should take cognizance, that the bill to incorporate the Texas Pacific Railway Company—the act in which the land grant was made to defendant company—was, and had been for some time, pending in congress, and that though the act was not a law until after the issuance of the bonds, the incorporators of defendant company expected, and had reason to believe, the said act would become a law, and the recitals in the bonds were intended to convey the idea to all concerned that the mortgage given to secure the bonds would operate on all the lands granted by congress to aid in the construction of the New Orleans, Baton Rouge & Vicksburg Railroad.   From the salient facts and circumstances which this case discloses, it is difficult to avoid the conclusion that the incorporators, having so great an enterprise on hand, with a subscription of $500,000, and only $25,000 of that amount paid in; the legislature, anxious to have the public work completed; and all parties interested, expected the main lines, over 500 miles in length, to be constructed with the money derived entirely from the sale of these bonds.   The company had the power to subject the lands that would be covered by the grant which was, at the time of the mortgage, being solicited from the government, and which congress shortly afterwards granted to defendant company, to a mortgage to secure the payments of any bonds it might issue in aid of its main lines and branches.   And when we consider its ample powers and the circumstances attending its organization and purpose, it seems to be reasonable to conclude that the directory of the company intended to exhaust all of their power and means to make the bonds now sued on an attractive and safe investment for capitalists.   In the very nature of things it seems that they, as well as

the public, could look alone to the successful negotiation or sale of these bonds for money to carry out their great purpose.

The draughtsman of the mortgage act, in his effort to show clearly, and emphasize by special and general recitals, what property was subjected to the mortgage, after using language, a critical analysis of which shows that the mortgagor intended to subject to the mortgage all the property, present and prospective, of the company,—that is, the "whole road;" using the word "road" as synonymous with corporation, as was done by the court in *Pierce* v. *Emery*, 32 N. H. 484,—as a whole thing, with all its corporate rights and franchises, and incidentally, and by way of accession, all of the subsequently acquired property of the road, concludes his description of the property by adding the following language: "Also the tenements, hereditaments, and appurtenances thereto belonging, and all *the estate, right, title, and interest, legal and equitable,* of the said company and its successors and assigns therein, together with all the corporate franchises and privileges of said company at any time granted, or to be granted, by the state of Louisiana relative to the construction, operation, or use of said railroad within said state." Suppose the defendant company, having authority to sell, had sold the property described in the mortgage act, could not the vendee, in a suit at law, vindicate title to the lands in question? Would it be held that the said lands were not embraced in an act of sale in which such language as found in this mortgage was used? The same words which, when used in act of sale, import a conveyance of certain lands must, when they appear in act of mortgage, import a mortgage of those lands. *Manufacturing Co.* v. *Bank,* 119 U. S. 191, 7 Sup. Ct. Rep. 187.

The New Orleans Pacific Railway Company, by way of illustrating the inequitable character of complainants' demands, says the New Orleans, Baton Rouge & Vicksburg Railroad Company never built any of the railway contemplated in its charter, and therefore never earned a foot of the land grant. The contention as to the defendant company never having built any of the road is true, as a fact; but if it be true in law that title vested, by reason of the grant, in defendant company, and that filing the map designating the route, in the general land-office, caused the title which was previously imperfect to acquire precision and attach to the lands mentioned in the grant, the fact as to whether any of the lands were earned by defendant company becomes a matter about which the grantor, and not the assignee, may inquire. Between the New Orleans Pacific Railway Company and the grantee, the defendant company, to whom congress saw fit, under such conditions as public policy suggested, to give the lands, there can be no question, under the facts in this case, for the court's consideration as to whether one or the other or neither of the parties earned the lands in question. There may or may not have been conditions imposed by congress on the grantee, the failure to comply with which would have authorized congress, by proper proceedings, to withdraw the lands from defendant company. But, so far as we are advised, the grantor has done nothing, beyond allowing the assignment of the lands to the New Orleans Pacific Railway Company, to affect the title

which was vested in the defendant company by the act March 3, 1873. And it is well settled that no individual can assail the title the government has given, on the ground that the grantee has failed to perform the conditions, if any, imposed on the grantee. *Schulenberg* v. *Harriman*, 21 Wall. 44. The New Orleans Pacific Railway Company took the lands as they were held by defendant, subject to all liens in equity or in law imposed on them in favor of the *bona fide* holders of these bonds. There was no withdrawal of the lands by the grantor, and no new grant of them made to the New Orleans Pacific Railway Company.

It was the policy of the government, probably at the solicitation and in the mutual interest of both companies, to allow and sanction the transfer of the lands, and the New Orleans Pacific Railway Company became the assignee, with full knowledge of all the facts. Notably among these facts it was known that the grant was one *in præsenti*, not one *in futuro*, or a promise to make a grant; that defendant company had in November, 1871, filed a map designating the route from Baton Rouge, via Alexandria to Shreveport, and that, by filing such a map, the title to the lands, previously imperfect, acquired precision, and attached to the lands; that the mortgage subjecting these lands to secure the payment of the bonds was registered at the company's domicile; that, whatever rights, in equity or in law, the mortgagees have, were vested in them prior to the transfer, and such rights cannot be affected by any equities which might appear to be in the New Orleans Pacific Railway Company because of the fact that that company constructed a railway from Baton Rouge, via Alexandria, to Shreveport. The facts and authorities show that whatever rights remained in the sovereign grantor, after the passage of the act under which the land grant was made to the New Orleans, Baton Rouge & Vicksburg Railroad Company, the title to the lands passed *in præsenti*, and was completed to that company when congress, in the interest of public policy, allowed or provided for their assignment. Congress did not make any effort to retake the lands, or to make a new grant of them to the New Orleans Pacific Railway Company, and we may fairly presume that its action, in allowing the transfer of the lands, was based on the view of the facts and law herein suggested. Considering that the lands at the time of the transfer were affected by complainant's mortgage rights, and that this suit can affect no property of the New Orleans Pacific Railway Company, the assignee under the favor of the government, and that complainant was in no way a party to the transfer, I do not think the facts set up by the assignee to show the absence of equity in complainant's demand can be heard to affect the rights he clearly had at the time of the said transfer. A decree will be entered for complainant.